Richards Will.

Argued March 21, 1967. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Harbaugh Miller,* with him *James Wilson Craw-ford,* and *Miller, Hay, Entwisle & Duff,* for appellant.

*John G. Frazer, Jr.,* with him *Judd N. Poffinberger, Jr.,* and *Kirkpatrick, Pomeroy, Lockhart & Johnson,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, April 18, 1967:

Miss Belle Richards died in her home on February 4, 1964, at the age of 78. An unsealed envelope addressed to her attorney was found in her desk. The envelope contained 6 yellow sheets of pencil writing and one white-ruled paper covered with writing in both ink and pencil. The 7 sheets were offered for

probate before the Register of Wills of Allegheny County who admitted to probate the 6 sheets as constituting a good and valid will and rejected the 7th sheet since it bore no signature.

Miss Richards' estate has been assessed at the value of $798,923.32, an amount prepossessing enough to attract relatives, no matter how far removed lineally. The relatives in this case are first and second cousins who were left nothing in the will. The leonine beneficiary of the testamentary disposition, if it is upheld, is the Pittsburgh Foundation, a charitable institution. If the Pittsburgh Foundation, named as the residuary legatee, is eliminated, the first and second cousins, as next of kin, stand to receive approximately 93% of $798,923.32. This windfall will descend on the next of kin or the Pittsburgh Foundation, according to how the Court rules on the following set of facts.

An examination of the 6 yellow sheets in question would reasonably establish that, in contemplation of her demise, Miss Richards made an inventory of her possessions and decided how she would distribute them among those who had withstood the winds of time and had remained within the halls of her memory of remembrance. On the first of the yellow pages, writing in lead pencil all the time, she listed rather informally by first names, certain of her friends and then at the bottom of the page referred to them more specifically. Then, physically or mentally, she toured her house and picked out furniture, linens, bric-a-brac, lamps, paintings and assigned them to this person and that person, often speaking to her favored legatees familiarly as if they were in her presence. She took note of her cousins only to the extent that she made no mention of them at all. It appears that they had had no contact with her in recent years and, although, of course, she could not have known this when she was preparing her will, they were not to visit her at the time of her death.

Engaged as she was in nostalgically recalling her associates and rewarding them with gifts of money or with tangible presents of some kind, she apparently overlooked, in disposing of the islands, the continent of her estate, namely, the stocks and bonds which made up the most of her fortune. On the 6th page she wrote "My Last Will & Testament the 3rd of May 1961." Below this she signed her name. As she surveyed what she had written, it apparently appeared to her that she could have done a better job with her handwriting so she wrote: "I'll have this done better if I have the time." Nevertheless, so long as she had committed herself to the testamentary task she went on, just in case this was indeed to be the last time she would address herself to the subject, and wrote "My jewelry I don't know. Sell it I guess—". And now, here, the continent of her fortune she disposed of with "& the balance of My Estate to go to The Pittsburgh Foundation." She then wrote in "(over)" and on the back side of the sheet, as if to confirm the identity of the residuary legatee, she wrote "I believe it is called— The one that gives to all or many needed Charities." And here she signed her name again, but she did not add the date again.

The first and second cousins saw in this omission of the date a weakening of the wall which had excluded them entirely from Miss Richards' fortune, and so they brought into play the battering ram of §7 of the 1947 Wills Act (20 P.S. §180.7) to knock down the wall entirely. That crucial section reads: "Any bequest or devise for religious or charitable purposes included in a will or codicil executed within thirty days of the death of the testator shall be invalid unless all who would benefit by its invalidity agree that it shall be valid. . ."

From all this rises the monumental question: When did Miss Richards write the codicil to her will? If she wrote it within 30 days of the date of her death, Feb-

ruary 24, 1964, the residuary disposition falls and the next of kin, the first and second cousins, inherit the bulk of the estate.

The natural lay assumption would be that, since the codicil follows so closely after the inscription of the date it must have been written on the same day, but the next of kin argue there are no assumptions or presumptions to draw on. Indeed, they go further and say that the burden of proof of showing that the writing occurred more than 30 days before death is on the declared legatee and, since it cannot summon Miss Richards to show that she wrote the entire 6 pages on one day, the codicil falls.

The Orphans' Court of Allegheny County held that the codicil was written on May 3, 1961, the same date as the will, and the next of kin have appealed. We will accordingly refer to them from now on as the appellants. The appellants argue that in reason it is easier for the legatee to show that the testator wrote the codicil beyond the 30-day limitation than it is for the appellants to prove that the writing occurred within the 30-day period. The appellants devote considerable space in their brief to the history of the 30-day rule, its devolution, development and present status. Briefly the purpose of the rule was stated by Chief Justice BELL in *McGuigen Estate*, 388 Pa. 475, 478: "The basic purpose of the 30 day requirement was and is to prevent a testator during his last illness from being importuned or otherwise influenced, by hope of reward or fear of punishment in the hereafter, to leave his estate in whole or in part to charity or to church. Since it would often be difficult to prove whether a man was in his last illness, or whether he had been importuned, or was unduly influenced by charity or church, or was influenced while *in extremis* by a sudden hope of Heaven or fear of Hades, the Legislature wisely established a clear, realistic and inflexible time period—30 days."

But we do not need to climb the narrow, altitudinous path to Heaven or follow the wide, well-paved, well-used boulevard to Hell in resolving the question in this case, since the controverted document speaks clearly for itself.

Two handwriting experts testified before the Orphans' Court, M. A. Nernberg for The Pittsburgh Foundation and Joseph Tholl for the next of kin. The testimony of Mr. Nernberg was direct, positive and unequivocal. The testimony of Mr. Tholl was indecisive, although this statement is not intended in any way to reflect adversely on his professional qualifications. The lower court, in passing on the competence of Mr. Nernberg, said: "Mr. Nernberg is a member of the bar of Allegheny County and has specialized as a handwriting expert for forty-two years. I have been acquainted with Mr. Nernberg for over forty-two years and his reputation as a handwriting expert is very excellent." Mr. Nernberg examined the will every day over a period of five days and placed it under a microscope in order to study the minute details of the writing. Mr. Tholl examined the will for about 2½ hours. Although he did say that he made a color slide of the will and studied the slide for several hours.

Mr. Nernberg's conclusion was that Miss Richards wrote out the additional clause, bequeathing the residue of the estate to The Pittsburgh Foundation, at the same time she signed her name on May 3, 1961. He said that his examination disclosed indisputably that Miss Richards used the same pencil in writing the codicil that she employed in drafting the main portion of the will. He described the writing instrument as a soft pencil with a hard substance that occasionally displayed itself during the course of the writing over the entire six pages; that there was no difference in the pressure applied by Miss Richards, or the type of margins she set out, the lineality, the width and character

of the pencil strokes, and the style of penmanship. All this, he said, led inevitably to the conclusion that the entire writing was accomplished at one time and not at different times.

Mr. Tholl, testifying for the appellants, said: "Q. As we understand you, Mr. Tholl, you are saying it is possible that this codicil was written any time from the date of her first signature until the time of her death? A. It could have been written any time. *It could have been written directly afterwards*, somewhere in between or shortly before death. You cannot tell really. It is all guesswork." (Emphasis supplied) Thus, even Mr. Tholl would not and did not rule out the conclusion reached by Mr. Nernberg, who had had the will under technical scrutinization for five consecutive days.

But even the manner in which the additional disposition is written and woven around Miss Richards' May 3, 1961 signature clearly reveals that it was part and parcel of the will signed by her that day. This is made even more evident by the fact that in the additional clause she is disposing of the largest part of her estate which she had not disposed of in the previous portions of her writing, and which, reasonably, she would not have delayed disposing of at a much later date.

The record shows that Miss Richards' attorney had advised her to sign her will at the end thereof or otherwise it would have no effect. Thus, when she added the codicil following her first signature, she signed again because that was now the end thereof. She did not re-date her signature since she had already dated the will. One may note that she did date the white paper (December 29, 1962). It is logical that if the last signature on the sixth yellow sheet had been placed at a time later than May 3, 1961, she would have placed the new date on the writing, as she placed the date on the seventh white page.

If, it be argued that the second signature was placed on the yellow sheet at the time she signed the white sheet, one is confronted with the very illogical proposition that she would add to the yellow sheets and re-sign after she had had written the seventh white page on December 29, 1962. If Miss Richards intended the white sheet (invalid, of course, because not signed) to substitute in any way for what was contained in the yellow sheets, she would have signed it. Thus, common sense and even a nonprofessional study of the pages, including the type of paper used, the pencil utilized, and the style of writing lead to the inescapable conclusion that the last signature on the sixth yellow page was placed thereon prior to December 29, 1962.

The weight of the evidence was more than sufficient to sustain a finding that the last signature on the sixth yellow page was affixed on May 3, 1961, or in any event, at least prior to December 29, 1962. The appellants produced no evidence to disprove this, their contention simply being that the date of execution cannot be ascertained with certainty. We are convinced, on the contrary, that the date of execution has been established beyond a moral certainty of doubt. We are satisfied that the court below did not abuse its discretion in reaching its findings and that those findings do not lack evidentiary support or that the court in any way "capriciously disbelieved the evidence." (*Shapiro v. Shapiro,* 424 Pa. 120.)

The decree of the court below is therefore affirmed, the costs to be equally divided.

Mr. Justice JONES, Mr. Justice COHEN, Mr. Justice EAGEN and Mr. Justice ROBERTS concur in the result.